Brett Schreiber (SBN 239707)
bschreiber@singletonschreiber.com
Meagan Verschueren (SBN 313117)
mverschueren@singletonschreiber.com
Katie Llamas (SBN 303983)
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE

**UNITED STATES DISTRICT COURT,**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, an individual,<br><br>Plaintiff,<br>v.<br><br>G6 Hospitality, LLC; G6 Hospitality IP, LLC; G6 Hospitality Property, LLC; G6 Hospitality Purchasing, LLC; G6 Hospitality Franchising, LLC; Motel 6 Operating, LP; Civic Center Hospitality Group, LLC; Greenleaf Boutique Collection, LLC; Shiv Partnership; USA SAI Hotel Investment, Inc.; Travel Inn Associates, L.P.; Jayesh Desai, an individual; and ROES 1-200, inclusive,<br><br>Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE, by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated both online, and in and out of hotels throughout the United States.

2. For years, major hotel brands have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3. Criminals parade their misconduct openly on hotel and motel properties throughout the United States, and profit from providing harbor for the underlying assaults. The hotel and hospitality industry continues to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4. Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

5. As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

6. Jane Doe, files this civil lawsuit seeking compensation for the harm she suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, maintained, regulated, and controlled by Defendants and their agents and employees.

## PARTIES

7. Jane Doe is a natural person who is currently a resident and citizen of Contra Costa County, California. Jane Doe is a survivor of sex trafficking. From 2012 to February 2017, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

a. Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies Jane Doe by a pseudonym only. Jane Doe will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe's true identity in order to protect Jane Doe and Jane Doe's identity.

b. Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c. In order to maintain her privacy and safety, Jane Doe should not be compelled to disclose her identity. Jane Doe's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe's claims once the parties have entered into a protective order.

8. Defendant Civic Center Hospitality Group, LLC is a for-profit California limited liability company with its principal place of business in Richmond, California. Defendant Civic Center Hospitality Group, LLC owned and operated the Civic Center Motel located at 425 24th

---

[2] Fed. R. Civ. P. 10(a).

[3] See Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).

[4] See Cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

Street, Richmond, California during the time Plaintiff was trafficked. At the time of the trafficking this hotel location was known as the Civic Center Motel.

9. Defendant Greenleaf Boutique Collection, LLC is a for-profit California limited liability company with its principal place of business in Santa Rosa, California. Defendant Greenleaf Boutique Collection, LLC owned and operated the Astro Motel located at 323 Santa Rosa Avenue, Santa Rosa, California during the time Plaintiff was trafficked.

10. Defendant Shiv Partnership is a for-profit partnership with its principal place of business in Oakland, California. Defendant Shiv Partnership owned and operated the Welcome Inn located at 9920 MacArthur Blvd, Oakland, California during the time Plaintiff was trafficked.

11. Defendant USA SAI Hotel Investment, Inc. is a for-profit corporation with its principal place of business in Hayward, California. Defendant USA SAI Hotel Investment, Inc owned and operated the Sands Motel located at 14800 San Pablo Ave, San Pablo, California from 2008-December 2015.

12. Defendant Travel Inn Associates, LP is a for-profit partnership with its principal place of business in Monterey, California. Defendant Travel Inn Associates, LP owned and operated the Sands Motel located at 14800 San Pablo Ave, San Pablo, California from December 2015 through the present.

13. Defendant Jayesh Desai is an individual who owned and operated the Sands Motel located at 14800 San Pablo Ave, San Pablo, California from December 2015 through the present.

14. Defendants USA SAI Hotel Investment, Inc, Travel Inn Associates, LP, and Jayesh Desai will be referred to collectively as Sands Motel Defendants.

15. Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

16. Defendant G6 Hospitality, IP, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

17. Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant G6 Hospitality Property, LLC owns and operates the Motel 6 hotel located at 1801 Embarcadero, Oakland, California. Defendant G6 Hospitality Property, LLC owned and operated this location during the time Plaintiff was trafficked. The Motel 6 located at 1801 Embarcadero, Oakland, California will be referred to as "Motel 6 Embarcadero."

18. Defendant G6 Hospitality Purchasing, LLC, is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

19. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

20. Defendant Motel 6 Operating, LP, is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

21. Defendants, G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC and Motel 6 Operating, LP will collectively be referred to as "G6 Parent Hotel Defendants."

22. G6 Defendants are registered to do business in the State of California and may be served at 1325 J Street, Suite 1550, Sacramento, California.

## **JURSIDCITION AND VENUE**

23. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

24. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Contra Costa County, California, and all Defendants are registered to do business in California.

## SEX TRAFFICKING UNDER FEDERAL LAW

26. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

27. The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

28. "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

29. The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

### Sex Trafficking of Jane doe

30. Starting in 2012, Plaintiff was subjected to sex trafficking at the Civic Center Motel at 425 24th Street, Richmond, California; Welcome Inn at 9920 MacArthur Boulevard, Oakland, CA; Sands Motel at 14800 San Pablo Ave, San Pablo California; Motel 6 Embarcadero at 1801 Embarcadero, Oakland, California; and Astro Motel at 323 Santa Rosa Avenue, Santa Rosa, California.

31. For approximately five years, Plaintiff's traffickers rotated between these hotels. These hotels were used by Plaintiff's traffickers for days at a time with Plaintiff and her traffickers encountering the same staff.

---

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

32. Plaintiff's traffickers would use the same named locations so often that she started to quickly recognize staff. The front desk and other staff would consistently see Plaintiff with her traffickers and would have realized they kept returning and exhibiting the same red flags of trafficking.

33. To control Plaintiff, her traffickers threatened her, beat her, and held her hostage. All of Plaintiff's belongings were taken by her traffickers. Plaintiff's traffickers would take her clothes, ID, phone, purse and shoes. While at the hotels, she was usually only in her bra and panties or a crop top and spandex shorts.

34. For long periods of time, Plaintiff's traffickers would not allow her to eat or drink water. She became very weak and dehydrated. She looked sickly, unwell, and unhealthy.

35. Plaintiff's traffickers would put ecstasy pills in her juice or water and on some occasions put eye drops in her water to knock her out. These tactics allowed her traffickers to control her. Plaintiff showed obvious signs of being drugged and controlled.

36. At one point, Plaintiff had to defend herself from one of her traffickers, using a knife.

37. Everywhere Plaintiff went she was being monitored, controlled, and watched closely by her traffickers and/or their associates.

38. Plaintiff's traffickers would give her a quota that she would have to meet every day. This quota usually meant she had to make at least $1,000 a day from her commercial sex acts ("dates") or she would be severely punished.

39. During this time Plaintiff was under the control of her traffickers and endured multiple beatings, threats and manipulation. Plaintiff was beaten so frequently by her traffickers that she would often have visible bruises.

40. There were frequent arguments and physical fights. These arguments and fights were loud, yet no one called the police for help. Staff at the subject motels saw and heard the fights occurring on their properties.

41. Staff at the subject motels saw the visible bruising on Plaintiff while she was with her traffickers.

42. Plaintiff's traffickers held her hostage at the hotels, not allowing her to leave on her own. While at the hotels one of her traffickers would tie her up so she could not escape. No matter how much Plaintiff begged and fought, her traffickers would not take her home or allow her to leave.

43. Plaintiff would be held hostage for months at a time at the same subject motels.

44. Plaintiff's traffickers would sit on her so she could not breathe.

45. When Plaintiff's traffickers would rent the rooms, they would leave her in the car. They would turn on the child-lock so she could not escape while they were gone. Being left in the car on hot days was brutal and just added to her abuse and their control. She would be forced to wait in the parking lot of the motels.

46. Plaintiff's traffickers would have multiple girls at the hotels. There was always traffic going in and out of the multiple rooms rented by Plaintiff's traffickers.

47. At all the hotel locations named Plaintiff's traffickers would not allow the cleaning crew in to clean the room or change out linens or towels. Instead, Plaintiff's traffickers or Plaintiff would ask for an extraordinary number of linens and towels throughout their stay.

48. While staying at the named subject hotel locations, Plaintiff's traffickers would post advertisements online offering Plaintiff for commercial sex acts to take place at the hotels and communicated with "johns" responding to the advertisements. While staying at the named subject hotel locations, Plaintiff was forced to take multiple dates per day, at all hours of the day and night.

49. Plaintiff's traffickers would either book her dates online from the hotels or force her to walk outside, get the dates, and bring them back to the hotel rooms. She was forced to take the date in the room and a short time later the buyer would leave.

50. Plaintiff would leave the hotels, dressed in very little clothing, come back a bit later with a male, be in the room for a short time and then the male would leave. She would then leave the hotel property and start this routine over again.

51. Each stay at the named subject hotel locations resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from other guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff's room at all times during the day and night; requesting multiple rooms; a male with multiple girls; visible signs of physical abuse; visible signs of Plaintiff's malnutrition; women wearing clothing inappropriate for the weather; and loud noises of abuse and other violence audible to staff and/or other rooms.

52. These red flags were open and obvious to anyone working at the named subject hotel locations and lasted for five years.

**The Hotel Industry's Role in Sex Trafficking**

53. In 2017, human trafficking was noted as the world's fastest growing crime.[6] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[7]

54. The hospitality industry plays a crucial role in the sex trade.[8] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the

[6] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at:
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking

[7] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.

[8] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell University School of Hotel Administration. Available at: http://scholarship.sha.cornell.edu/honorstheses/3.

known risks and known trafficking crimes, Hotels, including the Defendants, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular. Hotels, including the Defendants, knowingly harbor traffickers, buyers, and victims.

55. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[10]

56. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

57. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of commercial exploitation of children.

58. Due to the overall hospitality industry's complacency, complicity, and reckless disregard in addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking. Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

59. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

[9] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[10] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

60. Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to comply. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

61. Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[11] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

62. The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotels and hotel chains, including the hotels named in this complaint — they know it is unlikely that they will be disturbed.

63. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

64. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and

---

[11] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[12]

65. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of and were aware or should have been aware of at all subject times of the trafficking alleged herein, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
b. Individuals show signs of physical abuse, restraint, and/or confinement;
c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
e. Individuals lack freedom of movement or are constantly monitored;
f. Individuals avoid eye contact and interaction with others;
g. Individuals have no control over or possession of money or ID;
h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
i. Individuals have few or no personal items—such as no luggage or other bags;
j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
k. A group of girls appears to be traveling with an older female or male;

[12] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.

66. At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that was observable by Defendants.

67. Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

68. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

**G6 Parent Hotel Defendants' Control Over Their Hotel Defendant Location at 1801 Embarcadero**

69. G6 Hospitality Property, LLC owned the Motel 6 located at 1801 Embarcadero, Oakland, California during the time Plaintiff was trafficked.

70. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of the Motel 6 employees and staff of the Hotel location at 1801 Embarcadero, Oakland, California, which are G6 Parent Hotel Defendants' actual agents or subagents.

71. Upon information and belief, it is a standard practice in the hospitality industry, followed by G6 Parent Hotel Defendants, for Parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

72. G6 Parent Hotel Defendants provide their Motel 6 locations with signage on and in front of the buildings. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand. This brand logo is displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

73. G6 Parent Hotel Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by Parent Hotel Defendants.[13]

74. G6 Parent Hotel Defendants subject their hotel locations to detailed standards and requirements regarding the operation of the Motel 6 location named herein through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by G6 Parent Hotel Defendants.

75. Upon information and belief, G6 Parent Hotel Defendants require their branded hotel properties, including the Motel 6 named herein, to use a property management system. This

---

[13] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

system is linked to the G6 Parent Hotel Defendants' corporate network and data center. This is to, among other things, receive reservations, and process payment transactions.

76. Upon information and belief, per the relevant agreements, G6 Parent Hotel Defendants may enforce their brand standards through periodic inspections of the hotel locations, backed up with the ultimate threat of termination of the agreement.[14]

**Motel 6 Employees and Staff Acted as Actual Agents of G6 Parent Hotel Defendants**

77. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of their employees and staff of the location named herein, which are G6 Parent Hotel Defendants' actual agents or subagents.

78. G6 Parent Hotel Defendants subjected Motel 6 Embarcadero to detailed standards and requirements regarding the operation of the Motel 6 location named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Parent Hotel Defendants.

79. G6 Parent Hotel Defendants obscure the full extent of control they exercise over their branded properties by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Parent Hotel Defendants impose on their branded properties:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Motel 6 Embarcadero used at their Motel 6 locations;

b. Covered virtually all aspects of hotel operations, including internal operating functions;

[14] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

c. Dictated the specific manner in which Motel 6 Embarcadero and hotel staff must carry out most day-to-day functions at their Motel 6 location; and

d. Significantly exceeded what was necessary for G6 Parent Hotel Defendants to protect its registered trademarks.

80. In addition to the ways described above, upon information and belief, G6 Parent Hotel Defendants exercised and reserved the right to exercise systemic and pervasive control over G6 Hospitality Property, LLC's day-to-day operation of the subject Motel 6 Embarcadero location named herein, including the following ways:

a. G6 Parent Hotel Defendants required G6 Hospitality Property, LLC and management of the hotel to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Parent Hotel Defendants to protect their registered trademarks;

b. G6 Parent Hotel Defendants provided training for hotel management and select hotel staff on-site at the Motel 6 Embarcadero location selected by G6 Parent Hotel Defendants;

c. G6 Parent Hotel Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. G6 Parent Hotel Defendants controlled training provided by Motel 6 Embarcadero to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. G6 Parent Hotel Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Motel 6 Embarcadero was required to purchase to operate the Motel 6 location named herein, G6 Parent Hotel

Defendants designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor;

g. G6 Parent Hotel Defendants required Motel 6 Embarcadero to sign a technology agreement governing the terms under which it must procure and use technical services and software while operating the Motel 6 location named herein. Motel 6 Embarcadero was required to install, and use certain brands, types, make, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. G6 Parent Hotel Defendants set required staffing levels for the Motel 6 Embarcadero location named herein;

i. G6 Parent Hotel Defendants established detailed job descriptions for all positions in its Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 Parent Hotel Defendants set requirements for the hiring process used by Motel 6 Embarcadero and oversaw employee discipline processes and termination decisions;

k. G6 Parent Hotel Defendants provided benefits for employees of Motel 6 Embarcadero hotel;

l. G6 Parent Hotel Defendants required Motel 6 Embarcadero to use a customer resource management program maintained and operated by the G6 Parent Hotel Defendants;

m. G6 Parent Hotel Defendants controlled channels for guests to report complaints or provide feedback regarding the Motel 6 location and directly participated in the response and/or supervised the response to customer complaints or other feedback. G6 Parent Hotel Defendants retained the right

to provide refunds or other compensation to guests and to require Motel 6 Embarcadero to pay associated costs;

n. G6 Parent Hotel Defendants generated reports and analysis of guest complaints and online reviews for the subject Motel 6 location;

o. G6 Parent Hotel Defendants required Motel 6 Embarcadero to use a Guest Relations Application owned, operated, and maintained by G6 Parent Hotel Defendants to manage all guest data and information. G6 Parent Hotel Defendants could use the backend of this system to analyze data and generate reports;

p. G6 Parent Hotel Defendants set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if G6 Parent Hotel Defendants determine that the property has not purchased adequate insurance;

q. G6 Parent Hotel Defendants regularly audited the books and records of the subject Motel 6 Location;

r. G6 Parent Hotel Defendants conducted frequent and unscheduled inspections of Motel 6 properties, including the Motel 6 location named herein;

s. G6 Parent Hotel Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of agreements if Motel 6 locations violated any of the G6 Parent Hotel Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 location named herein;

t. G6 Parent Hotel Defendants controlled all marketing for subject the Motel 6 location and prohibited it from maintaining any online presence unless specifically reviewed and approved by the G6 Parent Hotel Defendants;

u. G6 Parent Hotel Defendants imposed detailed recordkeeping and reporting requirements on Motel 6 Embarcadero regarding virtually all aspects of hotel operations;

v. G6 Parent Hotel Defendants supervised and controlled day-to-day operations of the Motel 6 Embarcadero through detailed information and extensive reports that it obtained through the property management system and other software systems it required Motel 6 Embarcadero to use; and

w. G6 Parent Hotel Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the Motel 6 Embarcadero.

**G6 Parent Hotel Defendants Knowingly Benefited from Participation in a Venture with Motel 6 Location Defendant**

81. Hotel brands own properties and lend their name and likeness to third party owners, while the building and operations are under the brands' supervision and control. This is done through brand standards, franchise agreements, and maintaining control over all aspects of operations. This allows the parent brand to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a local property or franchise contract and still profit. Because of this, the hotel locations and parent brands—here G6 Parent Hotel Defendants and Motel 6 Location Defendant—are inextricably intertwined.

82. Additionally, Motel 6 Embarcadero was owned and operated by a G6 Parent Hotel Defendant entity, G6 Hospitality Property, LLC so they are even more intertwined here.

83. The average customer does not see this relationship. The parent brand gives the property its identity. The parent brand provides the signage that assures customers that if they check into that hotel they can expect the standards consistent with the parent brand. The parent companies – G6 Parent Hotel Defendants—hold themselves out to the public as the owners of the property. And here, they were the actual owner for the trafficking period. These brand

requirements are contractual with the power to control weighed heavily toward the corporate parent brand.

84. At all times of trafficking alleged herein and currently, booking and room reservations are controlled by the corporate parent brand.[15]

85. Upon information and belief, at all times of trafficking alleged herein and currently, the G6 franchised hotels typically pay a percentage of their total revenue back to the parent company and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

86. Upon information and belief, per the franchise agreements, G6 Parent Hotel Defendants, may enforce standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of G6 Parent Hotel Defendants to enforce their brand standards, including safety standards, is not just their right but their responsibility.

87. At all times of trafficking alleged herein, G6 Parent Hotel Defendants dictated policies related to safety, security, human trafficking, employee training and Motel 6 Location Defendant's response.

88. Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by G6 Parent Hotel Defendants.

89. G6 Parent Hotel Defendants, including G6 Hospitality Property, LLC, profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring.

90. G6 Parent Hotel Defendants, including G6 Hospitality Property, LLC, benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

---

[15] Meyer, Ellen, April 10, 2018. *The Origins and Growth of Franchising in the Hotel Industry.* Lodging Magazine.

91. G6 Parent Hotel Defendants, including G6 Property, LLC, profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored and maintained for the purpose of sex trafficking.

92. G6 Parent Hotel Defendants, including G6 Property, LLC, facilitated the trafficking through its practices, policies, and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

93. G6 Parent Hotel Defendants, including G6 Property, LLC owned and operated the subject property, located at 1801 Embarcadero, Oakland, California, while buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time at the subject Motel 6 location but ignored it so they could profit.

94. Plaintiff's trafficking at the subject Motel 6 location was a result of G6 Parent Hotel Defendants' and subject G6 Hospitality Property, LLC's participation in a venture with each other and Plaintiff's criminal traffickers. If G6 Parent Hotel Defendants, including G6 Hospitality Property, LLC had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

95. Despite its actual or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a), and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject hotel location named herein, G6 Parent Hotel Defendants, including G6 Hospitality Property, LLC participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of victims like Plaintiff.

96. G6 Parent Hotel Defendants and G6 Hospitality Property, LLC financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions.

97. G6 Parent Hotel Defendants and G6 Hospitality Property, LLC participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of hotel operations at the subject Motel 6 location.

**G6 Parent Hotel Defendants and G6 Hospitality Property, LLC's Knowledge of Sex Trafficking**

98. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Parent Hotel Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[16]

99. The Los Angeles nuisance settlement required G6 Parent Hotel Defendants to change policies that were facilitating sex trafficking.[17] G6 Parent Hotel Defendants knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Parent Hotel Defendants have failed to adequately implement and enforce such changes.

100. Public statements of G6 Parent Hotel Defendants confirm that they knew before and during the sex trafficking of Plaintiff that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Parent Hotel Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended

---

[16] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[17] *Id.*

to guests."[18] They also acknowledged the significant role they have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[19]

101. G6 Parent Hotel Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand hotels, including the subject Motel 6 property where Plaintiff was trafficked and abused.[20]

102. G6 Parent Hotel Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its branded hotels.[21]

103. Among some of the notable press involving frequent use of G6 hotels for illegal trafficking activity, the following was noted:

a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[22]

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[23]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[24]

---

[18] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[19] *Id.*

[20] https://g6hospitality.com/combating-human-trafficking/

[21] *Id.*

[22] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

[23] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[24] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[25]

e. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[26]

f. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[27]

g. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[28]

h. Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[29]

i. In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[30]

j. Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[31]

---

[25] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[26] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[27] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[28] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[29] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[30] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[31] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-

k. Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[32]

l. In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[33]

m. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[34]

n. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[35]

o. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[36]

p. In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[37]

---

mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[32] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[33] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[34] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[35] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[36] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[37] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.

q. Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[38]

r. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[39]

104. This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff was trafficked at the subject Motel 6 property, G6 Parent Hotel Defendants and G6 Hospitality Property, LLC knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at the G6 branded properties;

b. Sex trafficking was a brand-wide problem for G6 Defendants;

c. G6 owners and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking and harboring trafficking at the branded hotel properties; and

d. G6 and its hotel owners were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

105. G6 Parent Hotel Defendants and G6 Hospitality Property, LLC were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 location. They were aware of it generally and as it relates specifically to Plaintiff.

106. Google Reviews as seen below show what kind of activity went on during Plaintiff's time of trafficking at the Motel 6 Embarcadero located at 1801 Embarcadero, Oakland, California:

---

[38] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[39] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

a. A January 2015 Trip Advisor review states: "This place was horrible! The check-in guy was rude and not helpful. Their credit card machine didn't work and I had to pay cash. The room was tiny and noisy. Bed was horrible. There was all kinds of police activity all night and folks were running from room to room. Drug deals and hookers galore. Wouldn't stay there again if it was free."

b. A December 2014 Trip Advisor review states: "The walls are paper-thin, housekeeping is useless and won't sweep the floor or empty the trash. Homeless people and stray animals are constantly in the area."

c. A May 2017 Trip Advisor review stated: "Lots of sketchy people hanging around outside of rooms. More security cameras than your local SUPER MAX!"

d. A June 2017 Trip Advisor review states: "There was loud arguing and fighting in the room next to us. We called the police and as they were on their way, the person in the room next to us was shot."

107. G6 Parent Hotel Defendants and G6 Hospitality Property, LLC knew Plaintiff was being trafficked at the location named herein by the many red flags present during her continued stays. Plaintiff's traffickers paid for stays in cash, oftentimes were not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, do not disturb signs always up, frequent requests for new linens and towels but not letting cleaning staff into the rooms, men waiting out of the room while other men were inside with Plaintiff for short periods of time and a multitude of other red flags visible to Defendants.

108. During Plaintiff's stay at the Motel 6 located at 1801 Embarcadero, Oakland, California, she was forced, by her trafficker, to wear very little clothing. The front desk worker would tell Plaintiff and her traffickers that she couldn't dress like that if she was going to walk

through the lobby but still allowed them to stay and have male guests come in and out of the rented room at all hours of the night.

109. Plaintiff and her traffickers stayed at this location many times. There were some occasions that she would rent and other stays that he would rent.

110. One of Plaintiff's traffickers would keep her locked up in her room for long periods of time. He would tie her up for weeks.

111. When housekeeping would come to the door, Plaintiff's traffickers told them not to come in.

112. When Plaintiff was allowed to leave her room to go get dates she was scantily dressed, looked tired, cried a lot, had bruising on her wrists and arms from being tied up and grabbed during fights, she looked unhealthy, timid and scared.

113. There were multiple law enforcement calls to the subject Motel 6 property during the time Plaintiff was trafficked that would have put G6 Parent Hotel Defendants and G6 Hospitality Property, LLC on notice that trafficking was occurring at their property. These calls for service included multiple calls for disturbances, batteries, suspicious vehicles, suspicious persons, overdoses, sexual assaults, security checks, domestic violence, and prostitution.

**G6 Parent Hotel Defendants Facilitated the Trafficking of Plaintiff at the Motel 6 Location**

114. Upon information and belief, during the times Plaintiff was trafficked at the subject Motel 6 property located at 1801 Embarcadero, G6 Parent Hotel Defendants participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking offered at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a. G6 Parent Hotel Defendants assumed responsibility and control over the human trafficking response of their subject motel property, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

b. G6 Parent Hotel Defendants retained control over when its branded hotel would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded hotel location;

c. G6 Parent Hotel Defendants retained control over determining which hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity;

d. G6 Parent Hotel Defendants retained control to terminate hotel staff and/or agreements based on the response to human trafficking;

e. G6 Parent Hotel Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

f. G6 Parent Hotel Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel location, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

115. As a direct and proximate result of these egregious practices on the part of G6 Parent Hotel Defendants, Plaintiff and victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**<u>Hotel Defendants Facilitated Trafficking of Plaintiff</u>**

116. Hotel Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the hotel locations they owned and operated because the trafficking was the direct result of Hotel Defendants facilitating the trafficking at the subject locations.

117. Hotel Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject hotel locations when operating the hotel because these acts and

omissions were committed in the course and scope of employment. Hotel Defendants ratified these acts and omissions because Hotel Defendants failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to Hotel Defendants of sex trafficking occurring that the subject hotel locations.

118. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Hotel Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

119. Hotel Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate Plaintiff's sexual exploitation.

120. Hotel Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Plaintiff in ways including:

a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking;

b. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**Hotel Defendants' Knowledge of Sex Trafficking at Their Locations**

121. Hotel Defendants' knowledge is not limited to a general awareness of the problem

of sex trafficking in the hotel industry. Defendants have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and their branded properties, including the subject properties named herein.

122. Use of the subject motel location properties for sex trafficking is well known to Hotel Defendants. Upon information and belief, before and at the time Plaintiff was trafficked at the subject Hotel Defendant locations, each of the Defendants monitored criminal activity occurring at the hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those hotels, including the specific hotel properties where Plaintiff was trafficked.

123. Defendants knew staff at its properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms where victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

124. Hotel Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

125. Information that has become public through news stories establishes the entrenched and pervasive nature of Hotel Defendants' role in providing a venue where sex

trafficking has continued unabated for years. Hotel Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff.

126. During the period Plaintiff was trafficked at the subject locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking.

127. Other girls were trafficked by other traffickers at the same hotels at the same time as Plaintiff.

128. Other girls were trafficked by Plaintiff's traffickers at the same hotels and at the same time as Plaintiff.

129. Plaintiff's traffickers were often present with Plaintiff at check in and would linger around the hotel or in the parking lot while Plaintiff was forced to have sex with customers at the subject hotels. This was all in plain sight of Defendants' employees at the subject locations. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day, for years.

130. There was heavy foot traffic in and out of the rooms where Plaintiff and other victims were being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desk and around the property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

131. Plaintiff's traffickers would request rooms away from the front desk. Plaintiff's traffickers would have multiple women. Plaintiff would have been seen locked in the car in the parking lot while her trafficker rented the requested rooms from the front desk.

132. Plaintiff would have been seen by hotel employees as she was forced into the hotel rooms battered, bruised, tired, drugged, and unhealthy.

133. There were obvious signs consistent with trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

134. When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, and terrified. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees she passed by.

135. Upon information and belief, multiple employees at the subject hotel locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

136. As such, Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject motel locations named herein.

137. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue to receive evidence and reports that human trafficking is a known issue at their hotel locations.

**Civic Center Motel Defendants' Knowledge of Sex Trafficking at Their Location**

138. Civic Center management and employees knew trafficking was going on at their hotel. They knew this generally and they knew this about Plaintiff specifically.

139. Plaintiff's traffickers would give employees, including the manager, hush money. When the manager, known as "Pops" would start to complain about the noise or too much commotion, Plaintiff's traffickers would give him either extra money or drugs. The manager would stop complaining and allow them to continue to rent rooms there.

140. Upon information and belief, "Pops" and his brother managed the Civic Center Motel.

141. Plaintiff witnessed one of her traffickers give this manager "Pops" drugs and extra money so they could continue to stay there.

142. "Pops" was having sex with one of the other victims, who he knew was being sex trafficked at the same time as Plaintiff. It was well known to the trafficking victims staying there that "Pops" was paying the traffickers to have sex with their girls.

143. "Pops" would go around knocking on the doors demanding his payment. This was payment to keep quiet and allow trafficking to continue.

144. "Pops" would tell Plaintiff's traffickers how to have her dress so while around the hotel so they wouldn't attract law enforcement to their property.

145. "Pops" was friendly with Plaintiff's traffickers. He would come into their room and have conversations with her traffickers.

146. "Pops" would buy drugs from other people staying at the Civic Center Motel.

147. There were numerous occasions that cops would respond to this hotel during Plaintiff's time of trafficking. These calls for service were for things including but not limited to assaults, security checks, disturbances, welfare checks, calls regarding weapons, loitering, and robbery.

148. Plaintiff's traffickers were never kicked out of the Civic Center Motel, even after police were called.

149. Civic Center Motel was cited for violations of substandard property by the Contra Costa County Supervising Environmental Health Specialist just after Plaintiff was able to escape her traffickers.

150. Civic Center Motel was cited for violations including but not limited to substandard dwelling conditions, transient lodging, allowing customers and lodgers to stay for over 30 consecutive days, failure to keep required information and registration regarding customers, and allowing guests to register their cars there.

151. Plaintiff's traffickers were allowed to stay at the Civic Center Motel with her for over 30 consecutive days.

152. Employees and managers of the Civic Center Motel saw Plaintiff looking battered, weak, drugged and victimized with her traffickers,.

153. Employees and managers of the Civic Center Motel knew Plaintiff was being trafficked at their motel and did all they could to keep it quiet. They kept it quiet so they could continue to profit from their room rentals.

**Welcome Inn Defendants' Knowledge of Sex Trafficking at Their Location**

154. Welcome Inn's management and employees knew trafficking was going on at their hotel. They knew this generally and they knew this about Plaintiff specifically.

155. Plaintiff's traffickers would rent rooms at the Welcome Inn for the specific use of trafficking and victimizing Plaintiff.

156. Plaintiff and her traffickers were put in rooms with no working phones. Plaintiff was unable to call for help because there were no working phones in the rooms she was being trafficked out of.

157. On one occasion, Plaintiff ran to the front desk and frantically asked them to call the police. The front desk managers refused to call for help and told her that they don't call the police. They refused to help her. Plaintiff didn't have a phone, and she was forced to go back to her room with her violent traffickers. One of Plaintiff's traffickers was upset and proceeded to beat her.

158. Plaintiff's traffickers would either book her commercial sex act dates online from this hotel or force her to walk outside, get the dates, and bring them back to the hotel rooms. She was forced to take the date in the room and a short time later the buyer would leave.

159. Plaintiff would leave the hotel, dressed in very little clothing, come back a few minutes later with a male, be in the room for a short time, and then the male would leave. She would then leave the hotel property and start this pattern over again.

160. During the commercial sex act dates Plaintiff's traffickers would usually wait in the parking lot and then come up to the room to collect the money after the buyer would leave.

161. Employees and managers of the Welcome Inn saw heavy traffic going in and out of Plaintiff's room at all hours of the day and night.

162. Employees and managers of the Welcome Inn saw Plaintiff, looking battered, weak, drugged and victimized with her traffickers.

163. Employees and managers of the Welcome Inn gave Plaintiff's traffickers certain rooms without working phones.

164. Employees and managers of the Welcome Inn refused to call for help when Plaintiff specifically asked for it.

165. Plaintiff's trafficker had friends staying at the hotel, trafficking other victims, that would always keep an eye on her.

166. Employees and managers of the Welcome Inn knew Plaintiff was being trafficked at their motel and did all they could to keep it quiet.

**Sands Motel Defendants' Knowledge of Sex Trafficking at Their Location**

167. Sands Motel management and employees knew trafficking was going on at their hotel. They knew this generally and they knew this about Plaintiff specifically.

168. The rooms rented by Plaintiff and her traffickers were rented for the specific use of trafficking and victimizing Plaintiff.

169. From 2012 through 2016 law enforcement was called to the Sands Motel over 150 times. These calls for service included but were not limited to assaults, security checks, disturbances, welfare checks, calls regarding weapons, drug offenses, homicide, loitering domestic violence, and robbery.

170. Plaintiff's traffickers would force Plaintiff to rent the rooms here. Plaintiff would pay about $100 for each night.

171. While Plaintiff was being forced to perform commercial sex acts with strangers at the Sands Motel, her traffickers would either wait in another trafficker's room, on the stairs outside, or in the parking lot and then go back up to the room to collect the money.

172. Plaintiff's traffickers would either book her commercial sex act dates online from this hotel or force her to walk outside, get the dates, and bring them back to the hotel rooms. She was forced to take the date in the room and a short time later the buyer would leave.

173. Plaintiff would leave the hotel, dressed in very little clothing, come back a few minutes later with a male, be in the room for a short time, and then the male would leave. She would then leave the hotel property and start this routine over again.

174. Employees and managers of the Sands Motel saw heavy traffic going in and out of Plaintiff's room at all hours of the day and night. Hotel management would call the rooms Plaintiff and her trafficker were staying in to ask why so much traffic was going in and out of the room, but they were never kicked out for it.

175. Employees and managers of the Sands Motel saw Plaintiff looking battered, weak, drugged and victimized with her traffickers.

176. The front desk manager of the Sands Motel would give Plaintiff's trafficker the room key, even if he was not on the registration.

177. Employees and managers of the Sands Motel knew Plaintiff was being trafficked at their motel and did all they could to keep it quiet.

**Astro Motel Defendant's Knowledge of Sex Trafficking at their Location**

178. Astro Motel's management and employees knew trafficking was going on at their hotel. They knew this generally and they knew this about Plaintiff specifically.

179. Plaintiff's traffickers would rent rooms at the Astro Motel for the specific use of trafficking and victimizing Plaintiff.

180. Plaintiff was forced by her trafficker to walk around the hotel property and past the hotel lobby/office in either her underwear and bra or very little clothing.

181. Other traffickers would stay there with their victims. There were always so many females going in and out of the rooms with non-registered males.

182. The front desk manager would warn Plaintiff's traffickers that they would need to control her and keep her quiet while they stayed there. The front desk manager knew Plaintiff's traffickers were controlling her.

183. Plaintiff's traffickers would either book her commercial sex act dates online from this hotel or force her to walk outside, get the dates, and bring them back to the hotel rooms. She was forced to take the date in the room and a short time later the buyer would leave.

184. Plaintiff would leave the hotel, dressed in very little clothing, come back a few minutes later with a male, be in the room for a short time, and then the male would leave. She would then leave the hotel property and start this routine over again.

185. Employees and managers of the Astro Motel saw heavy traffic going in and out of Plaintiff's room at all hours of the day and night.

186. Employees and managers of the Astro Motel saw Plaintiff with her traffickers, looking battered, weak, drugged, and victimized.

187. Employees and managers of the Astro Motel knew Plaintiff was being trafficked at their motel and they did all they could to keep it quiet.

**Defendants are Jointly and Severally Liable for Plaintiff's Damages**

188. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

189. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION AGAINST DEFENDANTS

### Sex Trafficking under 18 U.S.C. § 1595

1. **Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

190. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 189.

191. Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

192. Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

193. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

**2. Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

194. Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 189, and 190 through 193.

195. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

196. Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known

that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, G6 Parent Hotel Defendants and Hotel Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. G6 Parent Hotel Defendants and Hotel Defendants' employees had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the traffickers and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

197. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of their respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

198. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**3. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Parent Hotel Defendants).**

199. Plaintiff reallege and incorporates the allegations in Paragraphs 1 through 189, and 191 through 193, and 194 through 198.

200. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

201. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

202. Motel 6 Location Defendants acted as the actual agents of G6 Parent Hotel Defendants when operating their respective hotel properties and in committing the wrongful acts and inactions alleged herein.

203. Through the wrongful acts and omissions described throughout this Complaint, G6 Parent Hotel Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate their respective hotel property.

204. G6 Parent Hotel Defendants are vicariously liable for the TVPRA violations of their franchisees, the Motel 6 Location Defendants, and the subagents of such franchisees.

205. Additionally, on information and belief, each of the G6 Parent Hotel Defendants participated in a joint venture operating the subject Motel 6 Defendant location. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

**JOINT AND SEVERAL LIABILITY**

206. "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[40] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[41]

207. Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in

---

[40] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

[41] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[42]

208. Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of her injuries and damages alleged herein.

**DAMAGES**

209. Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiff to sustain legal damages.

210. Plaintiff did suffer the following injuries as a direct and proximate result of Defendants, and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

a. actual damages;
b. direct damages;
c. incidental and consequential damages;
d. lost earnings and lost earning capacity;
e. necessary medical expenses;
f. life care expenses;
g. physical pain and suffering;
h. physical impairment;
i. mental anguish and emotional distress damages (until trial and in the future);
j. restitution;
k. unjust enrichment; and
l. disgorgement of profits.

211. Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

---

[42] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

## PUNITIVE DAMAGES

212. Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## ATTORNEY FEES

213. Plaintiff is entitled to recover their costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

214. All conditions precedent to Plaintiff's recovery of its costs and attorney's fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

215. Plaintiff requests a jury trial in this action.

## PRAYER

216. For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a. all economic damages to which they are entitled;
b. all actual damages to which they are entitled;
c. all incidental and consequential damages to which they are entitled;
d. all mental anguish and emotional distress damages to which they are entitled;
e. all restitution damages to which they are entitled;
f. all disgorgement of profits to which they are entitled;
g. all unjust enrichment damages to which they are entitled;
h. exemplary, treble, and/or punitive damages;
i. attorneys' fees and costs of suit;

j. pre-judgment and post-judgment interest at the highest rate allowed by law; and

k. all other relief to which they are entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: November 20, 2024

By: /s/ Katie Llamas___________
Brett Schreiber (CA 239707)
Meagan Verschueren (CA 313117)
Katie Llamas (CA 303983)
Attorneys for Plaintiff